**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TRACY JORDAN, SR.,** *Plaintiff,* | : | |
| **v.** | : | **CIVIL NO. 25-3651** |
| **CITY OF PHILADELPHIA et al.,** *Defendants.* | : | |

**Scott, J.** **September 10, 2026**

# MEMORANDUM

Plaintiff Tracy Jordan, Sr., a Marine Corps veteran and former Philadelphia Housing Authority police officer, spent twenty years in custody for a murder he did not commit. While he was unjustly imprisoned, Jordan endured personal hardships and missed out on moments that make life meaningful: his mother's health deteriorated significantly and she passed away within months of his release; his marriage ended in divorce; his three children grew up largely without his presence; and he missed the birth of six grandchildren.

Jordan's wrongful conviction was, he alleges, the result of a shoddy and one-sided police investigation that sought to convict him from the outset. In 2023, the Conviction Integrity Unit of the Philadelphia District Attorney's Office reviewed his case, confirmed the improprieties in his conviction, and exonerated him. Jordan now brings suit under 42 U.S.C. § 1983 against the City of Philadelphia, the District Attorney's Office of Philadelphia ("DAO"), the Philadelphia Police Department, Detective James Griffin, Detective Dennis Dusak, Lieutenant Joseph Maum, Sergeant Robert Kuhlmeier, Officer Robert Stott, and the estate of Assistant District Attorney Edward Cameron.

Jordan brings the following claims: malicious prosecution, unlawful seizure, and false imprisonment in violation of the Fourth and Fourteenth Amendments against Defendants Griffin,

Kuhlmeier, and Maum (Counts I–III); deliberate deception in violation of the Fourteenth Amendment against Defendants Griffin, Dusak, Maum, Kuhlmeier, and Cameron (Count IV); deliberate deception in violation of the Sixth and Fourteenth Amendments against Defendant Stott (Count V); withholding exculpatory evidence in violation of the Fourteenth Amendment against Defendants Griffin, Dusak, Maum, and Kuhlmeier (Count VI); fabrication of evidence in violation of the Fourteenth Amendment against Defendant Griffin (Count VII); destruction of evidence in violation of the Fourteenth Amendment against Defendant Griffin (Count VIII); reckless conduct of a police investigation and intentional failure to investigate against Defendants Griffin, Dusak, Maum, and Kuhlmeier (Count IX); failure to intervene against Defendants Griffin, Dusak, Maum, and Kuhlmeier (Count X); civil rights conspiracy against Defendants Griffin, Dusak, Maum, Kuhlmeier, Stott, and Cameron (Count XI); municipal liability against the City of Philadelphia (Count XII); and municipal liability against the District Attorney's Office of Philadelphia (Count XIII).

Defendants have filed two Motions to Dismiss. ECF Nos. 23, 40. For the reasons discussed below, the Motions to Dismiss are granted in part and denied in part.

## I. Factual Background[1]

### A. *The Murder of Harold Wexler*

On November 15, 2004 at approximately 8:45 a.m., Harold Wexler was shot and killed inside a check-cashing store located at 8000 Ogontz Avenue in Philadelphia, which he owned and operated. Complaint, ECF No. 1, ¶ 28 (hereinafter "Compl."). Terrance Crawford, who worked at this store, was the sole eyewitness to the murder. *Id.* ¶¶ 29–30. In his statement to Detective Dusak, Crawford described the shooter as an older black male, about 5'8 or 5'9, weighing roughly

[1] For purposes of these motions, the Court construes all well-pleaded allegations as true.

210 pounds with a trimmed but full beard. *Id.* ¶ 36. At the scene, officers lifted a set of fingerprints from an interior handle in the store and a latent thumbprint from a white Sneaker City bag. *Id.* ¶ 37. The officers also recovered a black plastic bag at the scene. *Id.* ¶ 124. Crawford stated during his initial interview that the shooter "had a dark-colored bag over his shoulder that he had the gun in . . . ." *Id.* ¶ 122.

Harold Wexler was not merely the owner of a check-cashing store. As the investigating detectives learned from an FBI agent, an IRS agent, and Wexler's attorney within hours of his murder, Wexler was also an FBI cooperating witness who had pleaded guilty to federal money-laundering charges related to a scheme that ran out of his store and who was scheduled to report to prison two months after his murder. *Id.* ¶¶ 38, 45. Two weeks after Wexler's murder, apparently in an effort to assist Philadelphia detectives in their homicide investigation, the Government successfully moved to unseal Wexler's sentencing memorandum and the motion for a downward departure, so that Defendants Maum, Kuhlmeier, and Griffin could use the information contained therein. *Id.* ¶¶ 46–49.

On November 15, 2004, Defendant Dusak made two notes that memorialized conversations Dusak had with Juanette Williams (a former employee of Wexler) and with Wexler's family. *Id.* ¶¶ 52–54. Both notes identified another former employee of Wexler, referred to as "K," as an individual with knowledge of Wexler's money-laundering crimes and whom Wexler had fired for cooperating with federal authorities against him. *Id.* ¶¶ 53–56.

Jordan alleges that Wexler's status as a cooperating witness with the federal government (which Jordan alleges to be an alternative motive for Wexler's murder) was never disclosed to his defense counsel during his trial. *Id.* ¶ 51. Jordan also alleges that Philadelphia police officers

never physically interviewed Juanette Williams nor "K," and that the notes of Dusak's phone conversations were never disclosed prior to Jordan's trial.

Additionally, the black plastic bag at the scene was discarded after a Crime Scene Unit officer failed to find any fingerprints on it. *Id.* ¶ 125. Jordan also alleges that Harold Wexler had security cameras that were taping his store on the day of Wexler's murder, but Defendant Griffin and "other Philadelphia police personnel destroyed these tapes." *Id.* ¶ 317.

B. *The Targeted Investigation of Tracy Jordan, Sr.*

Tracy Jordan's fingerprints matched those on the Sneaker City bag that officers collected. Compl. ¶ 57. Jordan's fingerprints were in the Automated Fingerprint Identification System not because he had a criminal record but because he had worked as a Philadelphia Housing Authority police officer. *Id.* ¶ 59.

Because of this match, Defendant Griffin and another detective interviewed Jordan, who voluntarily stated to the detectives that he would visit Wexler's store to purchase lottery tickets and to pay bills via Western Union. Jordan also told the detectives that he was not at the store the day Wexler was murdered but rather was at home with his family. *Id.* ¶¶ 60–61. Jordan further volunteered to the detectives that Nannette Jordan, his then-wife, kept a stainless-steel .40-caliber Smith & Wesson Model 4043 firearm at their home, which she possessed pursuant to her employment as a Philadelphia Housing Authority Police Officer. *Id.* ¶¶ 62–63. Nannette Jordan stored her weapon, which also had a trigger lock, on the top shelf of her bedroom closet when she was off duty. *Id.* ¶ 67. At the time of Wexler's murder on November 15, 2004, Nannette Jordan had last fired her weapon in May 2004, as part of her annual firearms certification training as a police officer, after which she cleaned her weapon. *Id.* ¶¶ 68–69. After the May 2004 training and up until November 20, 2004, Jordan alleges that Nannette Jordan's firearm had not been fired, was clean, and was free of gunpowder fouling. *Id.* ¶ 80.

On November 20, 2004, two days after Jordan's voluntary statement, officers obtained a warrant to seize Nannette Jordan's weapon. *Id.* ¶ 63. In compliance with that warrant, Nannette Jordan delivered her service weapon to the Philadelphia Police headquarters on November 20, 2004 at 12:15 p.m. *Id.* ¶ 86. The 12:15 p.m. delivery is confirmed by a Philadelphia Police Department property receipt, which states that Defendant Griffin received the weapon at 12:15. *Id.* ¶ 89. At 1:00 p.m. on that same day, Defendant Griffin submitted Nannette Jordan's firearm to the Firearms Investigation Unit ("FIU"), which determined that the weapon contained gunshot residue in the barrel and slight damage to the weapon's rear sight. *Id.* ¶¶ 90–94. Jordan alleges that, during the forty-five-minute gap between receiving the weapon and delivering it to the FIU, Griffin fired the weapon and damaged the rear sight for the express purpose of incriminating Jordan. *Id.* ¶¶ 94–95.

C. *Ballistics Evidence and Bunter Mark Comparisons*

On November 24, 2004, an FIU officer compared the ballistics recovered from the murder scene to test-fired ballistics from Nannette Jordan's service weapon, concluding that both bullets were fired from the same gun. Compl. ¶ 97. The officer arrived at this conclusion through a "bunter mark comparison," which determines whether two bullets share common marks by comparing the microscopic characteristics of an indentation on the head of a cartridge case left by a bunter stamp. *Id.* ¶ 99. Because bunters degrade over time, the same bunter marking appears on approximately 120,000 to 150,000 cartridges before a bullet manufacturer must replace the bunter. *Id.* ¶ 102. Comparing bunter marks can determine whether two bullets were manufactured from the same set of 120,000 to 150,000 cartridges but cannot determine whether two bullets were fired by the same weapon. *Id.* ¶ 103; *see also id.* ¶ 252 ("At best, a bunter mark match only provides evidence that two bullets are from the same batch of bullets stamped by the same bunter. It conveys no information about a weapon itself . . . ."). Despite this limitation, the FIU officer still concluded

that Nannette Jordan's weapon fired the bullet found at the murder scene and transmitted this conclusion to the homicide detectives on the same day. *Id.* ¶¶ 103–04.

Two years later, on February 23, 2006, the FIU reexamined the bunter marks comparison analysis. *Id.* ¶ 107. The FIU's conclusion changed to a determination that the results were inconclusive as to whether Nannette Jordan's weapon fired the bullet found at the murder scene. *Id.* ¶ 108.

On February 27, 2006, another FIU examiner conducted a second reexamination, and the results were again determined to be inconclusive. *Id.* ¶ 110. After this second reexamination, the FIU uploaded images of the ballistics evidence recovered from the murder scene and from the test-fire of Nannette Jordan's weapon to the National Integrated Ballistic Information Network ("NIBIN"). *Id.* ¶ 112. The NIBIN system did not return a match between Nannette Jordan's service weapon and "any other entry in the database, including the bullets from the scene of Harold Wexler's murder." *Id.* ¶ 113. More recent retesting, using higher quality images, has "exclud[ed] Ms. Jordan's weapon [as the firearm used to murder Wexler] and squarely refut[ed] the Commonwealth's case against Tracy Jordan, Sr." *Id.* ¶ 117. The negative ballistics NIBIN result was never disclosed to Plaintiff Jordan's counsel. *Id.* ¶¶ 114, 198, 202.

Nor was this bunter mark comparison an isolated anomaly. Jordan alleges that, at least until 2010, the Philadelphia Police Department customarily relied on bunter mark matches as positive ballistic evidence to support the inference that a weapon could be matched to a bullet uncovered from a crime scene. *Id.* ¶¶ 244–45. This practice of using bunter mark comparisons entails, on Jordan's view, that police officers often presented false ballistics matches as evidence sufficient to support a finding of probable cause and of conviction. *Id.* ¶ 254.

D. *Defendant Griffin's Specious Affidavit of Probable Cause*

Jordan alleges that Detective Griffin's affidavit of probable cause in support of Jordan's arrest contained material falsehoods and material omissions. *Id.* ¶ 118. The falsehoods and omissions are legion, and, although the Court need not be exhaustive at this stage, a summary of some alleged improprieties with the affidavit suffices for present purposes. First, Detective Griffin grossly mischaracterized in the affidavit what Terrance Crawford told police.[2] Second, the affidavit omitted that police recovered a fingerprint from the interior door handle of Wexler's store that matched Frank Bagley, who had prior convictions for forgery, drug possession, and other offenses. *Id.* ¶ 136. Third, the affidavit omitted any mention of Wexler's conviction, pending incarceration, and his extensive cooperation with federal authorities, all of which would suggest an alternative motive for Wexler's murder. *Id.* ¶ 145. Fourth, the affidavit misleadingly described the bunter mark analysis as a "positive comparison" without acknowledging the limitations of this analysis. *Id.* ¶ 137. Fifth, and finally, the affidavit omitted that a police dive team had recovered Wexler's briefcase, laptop, and hard drives from the Schuylkill River in Philadelphia, which may have indicated that Wexler was murdered to destroy potential evidence on the computer. *Id.* ¶¶ 146, 162.

E. *Detectives Fail to Investigate Other Suspects and an Alternative Motive*

There were at least two alternative suspects in the murder of Harold Wexler: Frank Bagley and Warren Wright. Frank Bagley's fingerprints were found on the interior door handle of the check-cashing store, and Bagley had been convicted of forgery and drug possession. Compl.

[2] Whereas Crawford told officers that the shooter stored the gun in a dark-colored bag, the affidavit claimed that Crawford told officers that the gunman dropped a white plastic bag and a brown bag; whereas Crawford told officers that the shooter was around 5'9 with a full beard, the affidavit omitted that Tracy Jordan, Sr. was 6'1 and was not able to grow a full beard due to a skin condition; whereas Jordan told officers that he was a customer at Wexler's store, the affidavit states that Jordan told officers he "had no knowledge or reason why his fingerprint was on the white 'Sneaker City' bag found at the scene." Compl. ¶¶ 120, 122, 126–28, 133–34.

¶¶ 163–65. Police questioned Bagley on November 22, 2004 and interviewed his girlfriend; during the questioning of Bagley, police did not ask Bagley or his girlfriend about his alibi on the day of Wexler's murder. *Id.* ¶¶ 166–67. Police also declined to include Bagley's photo among those shown to Terrance Crawford when they asked Crawford to identify the shooter. *Id.* ¶ 168.

An anonymous tip identified Warren Wright as the shooter. *Id.* ¶ 169. The tip included information that Wright kept the murder weapon in a black bag, which was consistent with the nonpublic account that Terrance Crawford gave to police. *Id.* ¶ 171. Additionally, Warren Wright matched the physical description that Crawford gave of the shooter, and Wright had a criminal history that included burglary and theft. *Id.* ¶¶ 172–73. On December 1, 2004, police officers searched Wright's vehicle and found a loaded weapon with obliterated serial numbers. *Id.* ¶ 174. Police did not arrest Wright and apparently did not show his photo to Crawford for identification. *Id.* ¶¶ 176, 180. Police also obtained information that Wright frequented the area close to Wexler's store. *Id.* ¶ 178. Despite this evidence, there was no further investigation of Wright and none of this information was disclosed to Jordan's defense counsel. *Id.* ¶¶ 181–83.

Harold Wexler's impending imprisonment, cooperation with federal authorities, prior criminal activity, and the discovery of his briefcase in the Schuylkill River provide an "obvious motive for [Wexler's] murder—silencing Wexler before he could testify against his co-conspirators." *Id.* ¶¶ 154–62. And yet the Defendants, per Jordan's allegations, refused to investigate any further this potential explanation of Wexler's murder. *Id.* ¶ 160.

F. *H-Files and H-Binders*

The Philadelphia Police Department's Homicide Unit maintained an "H-File" (also known as a "homicide file," "murder file," or "M-File") for each murder that its officers investigated. Compl. ¶¶ 184–86, 241. The H-File contained evidence and information that the officers collected during a murder investigation. *Id.* ¶ 186.

Jordan alleges that the Philadelphia Police Department and the District Attorney's Office had a widespread policy or custom of permitting officers—at their sole discretion—to curate a subset of information contained in the H-file into "H-Binders." *Id.* ¶¶ 241–42. These "H-Binders" were given to trial prosecutors and often did not include potentially exculpatory evidence. *Id.* ¶¶ 242–43. The net effect of this practice would be to deprive criminal defendants from being aware of potentially exculpatory evidence, even though *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) obligate the disclosure of such evidence to criminal defendants. *Id.* ¶ 243.

Jordan further alleges that the DAO was a struthious participant, willingly burying its head in the sand by failing to verify whether the H-Binders provided by the detectives matched the more comprehensive H-Files. *Id.* ¶¶ 267–68. Two facts clearly support this allegation. First, Defendant (and then Assistant District Attorney) Ed Cameron stated in an email, disclosed in 2021, that "better detectives don't take notes or write down the obvious lies," that he was aware that the Homicide Unit "never advise[d] defense attorneys about this [practice]," and that the DAO Homicide Unit prosecutors "advise[d] detectives to take separate statements on other cases" in an effort to compartmentalize disclosures made to criminal defendants. *Id.* ¶¶ 269–71. Second, Jordan cites at least ten other cases of individuals who were wrongfully convicted due in part to the withholding of exculpatory evidence. *See id.* ¶¶ 264–66.

In Jordan's case, the H-File and H-Binder practice resulted in several key pieces of evidence being withheld from him, including information about Wexler's criminal history and cooperation agreement, information about Warren Wright as a potential suspect, information about Terrance Crawford's potential unreliability as a witness, and the 2006 NIBIN report that stated

Nannette Jordan's weapon was not a match to the bullet recovered at the murder scene. *Id.* ¶¶ 189–203.

## II. Legal Standards

### A. *Motion to Dismiss*

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausibility means 'more than a sheer possibility that a defendant has acted unlawfully.'" *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In considering a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded allegations in the complaint as true and interpreted in the light most favorable to the plaintiff, and all inferences are drawn in the plaintiff's favor. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) (quoting *Schrob v. Catterson*, 948 F.2d 1402, 1408 (3d Cir. 1991)).

### B. *Qualified Immunity*

Because qualified immunity arguments apply to almost every Count, the Court considers it more efficient to explain the standard once, at the outset.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important

interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

The test to determine whether qualified immunity applies is a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Id.* at 656 (citation modified). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "The salient question is whether the state of the law at the time of the incident provided 'fair warning' to the defendants 'that their alleged conduct was unconstitutional.'" *Id.* (citation modified). "'Clearly established' for purposes of qualified immunity means that 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614–15 (1999) (citation modified). "Thus, qualified immunity does not apply when the facts, taken in the light most favorable to the party claiming injury, show that the officer's conduct violated a constitutional right, and, as an additional condition, when the right at issue—'defined at the appropriate level of specificity'—was 'clearly established.'" *Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 299 (3d Cir. 2024) (quoting *Lozano v. New Jersey*, 9 F.4th 239, 245 (3d Cir. 2021)) (citation modified). The "ultimate question is whether the state of the law when the offense occurred . . . [provided defendants] 'fair warning' that their conduct violated [a plaintiff's constitutional or statutory rights]." *Clark v. Coupe*, 55 F.4th 167, 181 (3d Cir. 2022) (quoting *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247 (3d Cir. 2016)).

The Court may choose which prong of the qualified immunity inquiry to engage with first because both must be satisfied.

## III. Discussion

### A. *Count I for Malicious Prosecution*

To state a § 1983 claim for malicious prosecution in violation of the Fourteenth Amendment, Plaintiff must allege that "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (citing *Donahue v. Gavin*, 280 F.3d 371, 379–80 (3d Cir. 2002)).

Defendants' first argument is that they had probable cause to arrest Jordan, so Plaintiff cannot make plausible allegations concerning the third element of a malicious prosecution claim. Probable cause is a "reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense." *Thomas v. E.J. Korvette, Inc.*, 476 F.2d 471, 474 (3d Cir. 1973) (quoting *Miller v. Pa. R.R. Co.*, 89 A.2d 809, 812 (Pa. 1952)). But Defendants' argument asks the Court to do too much at this stage. As the Parties know well, the Court accepts as true Plaintiff's well-pleaded allegations when deciding a motion to dismiss. Under this posture, Plaintiff's allegations make plausible that the criminal proceeding against him was initiated without probable cause.

Determining whether probable cause existed requires the Court to "measure the cumulative weight of all the evidence and account for reasonable inferences that can be drawn from it." *Halsey v. Pfeiffer*, 750 F.3d 273, 302 (3d Cir. 2014). Under the Court's measurement, the Defendants' material omissions and false statements are sufficient to cast doubt on whether probable cause

existed. *See, e.g.*, *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (finding that courts may discount the existence of probable cause when an "affiant willingly and 'affirmatively distorted the truth'" or when "an officer withholds a fact in his ken that 'any reasonable person would have known . . . was the kind of thing the judge would wish to know.'") (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)) (citation modified).

Under the facts alleged, Defendant Griffin omitted, among other things, in the affidavit of probable cause that (i) the sole eyewitness to Wexler's murder, Terrance Crawford, did not identify Jordan in a photo lineup, (ii) Jordan did not match the eyewitness's description of the suspect, (iii) the ballistics testing gave the false impression that Nannette Jordan's service weapon fired the bullets that killed Wexler, and (iv) Wexler was a cooperating witness for a federal investigation and had been convicted of money laundering. *See generally supra* Section I. Accordingly, the Court finds that Plaintiff has sufficiently alleged that the proceeding against Jordan was initiated without probable cause.

Defendants' second argument is that the Officer Defendants enjoy qualified immunity because, on their view, there was no clearly established due process right against malicious prosecution under the Fourteenth Amendment when Plaintiff was convicted of Wexler's murder in 2006. Defendants' argument requires the Court to wade into a divide in this Circuit about the viability of a malicious prosecution claim under the Fourteenth Amendment. *See, e.g.*, *Crosland v. City of Phila.*, 676 F. Supp.3d 364, 375 (E.D. Pa. 2023) (observing that, "as of today, the status of a Fourteenth Amendment right to be free from malicious prosecution is murky."). Because Defendants' argument concentrates on whether there was a "clearly established due process right against malicious prosecution under the Fourteenth Amendment in 2006," the Court will focus on that prong of the qualified immunity inquiry first. ECF No. 40 at 41.

The Court is persuaded by the *Crosland* court's well-reasoned decision. The murkiness that Defendants have identified pertains more to changes in the doctrinal landscape after the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266 (1994) than it does to the existence of the legal right to be free from malicious prosecution. As Judge Brody stated in *Crosland*, "though *Albright* may have altered the underlying legal analysis, the right's existence was never in doubt." *Crosland*, 676 F. Supp.3d at 378. Other cases confirm that a right to be free from malicious prosecution predates Jordan's arrest and conviction. *See, e.g.*, *Gallo v. City of Phila.*, 161 F.3d 217, 220 n.4 (3d Cir. 1998) (noting that, prior to 1994, officer defendants were "not entitled to qualified immunity because the pre-*Albright* law of this circuit clearly provided that malicious prosecution violated federal law"); *see also Torres v. McLaughlin*, 163 F.3d 169, 173 (3d Cir. 1998) (observing that a § 1983 claim may "include police conduct that violates the Fourth Amendment, the procedural Due Process clause, or other explicit text of the Constitution").

Because the Court finds that the Officer Defendants' conduct, as alleged, violated a federal right that was clearly established at the time of Jordan's arrest and conviction, the Court declines to find that the Officer Defendants are entitled to qualified immunity at this stage of the proceedings.

B. *Counts II and III for Unlawful Seizure and False Imprisonment*

Defendants argue that Counts II and III are time-barred under the operative statute of limitations. ECF No. 40 at 17–20. The limitations period for a § 1983 action is the limitations period for personal injury torts in the state where the cause of action arose. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). Pennsylvania has a two-year statute of limitations for personal injury torts. 42 Pa. Cons. Stat. § 5524(2). Plaintiff alleges that he was unlawfully seized and falsely imprisoned on November 24, 2004, when he was arrested. Compl. ¶ 151. Defendants argue that Plaintiff's unlawful seizure and false imprisonment claims must have been asserted, at the latest, by April 6,

2007 to satisfy the operative statute of limitations; Jordan's Complaint was filed in 2025, almost two decades after the April 6, 2007 deadline. Accordingly, Defendants argue that these claims are time-barred.

Jordan does not contest Defendants' argument that Counts II and III are time-barred. ECF No. 50 at 41 n.6. Accordingly, and pursuant to Local Civil Rule 7.1 for the Eastern District of Pennsylvania, the Court grants this portion of Defendants' Motion to Dismiss as uncontested and therefore dismisses with prejudice Counts II and III. *See also Celestial Cmty. Dev. Corp. v. City of Phila.*, 901 F. Supp. 2d 566, 578 (E.D. Pa. 2012) (collecting cases and holding that a court may grant as uncontested any unopposed portions of a motion to dismiss).

C. *Counts IV and V for Deliberate Deception*

To state a deliberate deception claim, Jordan must allege that his imprisonment resulted from "the knowing use of false testimony, other fabricated evidence, or from concealing evidence to create false testimony to secure a conviction." *Dennis v. City of Phila.*, 19 F.4th 279, 291 (3d Cir. 2021) (citation modified). A deliberate deception claim must go beyond "the failure to disclose evidence" under *Brady*. *Id.* In Count IV, Jordan alleges that Officer Defendants Griffin, Dusak, Maum, Kuhlmeier, and ADA Cameron committed deliberate deception in violation of his Fourteenth Amendment due process rights by presenting false or misleading testimony, failing to correct false testimony presented by others, fabricating evidence, concealing and withholding exculpatory evidence, and deceiving the Court that Tracy Jordan, Sr. murdered Harold Wexler. Compl. ¶ 294. In Count V, Jordan alleges that Officer Defendant Stott committed deliberate deception by presenting false testimony that he "co-examined" the faulty ballistics examinations, which also denied Jordan his Sixth Amendment right to confront and to cross-examine the actual technician that performed the ballistics analysis. *Id.* ¶ 299.

Defendants point to the sound rule that "allegations of false testimony, in isolation, cannot sustain a deliberate deception claim." *Gainey v. City of Phila.*, 704 F. Supp.3d 589, 600 (E.D. Pa. 2023). It necessarily follows from this rule that Jordan cannot rely solely on allegations of false testimony to ground a deliberate deception claim; the penalty for false testimony is a potential perjury charge, not a § 1983 civil liability claim. *See, e.g.*, *Hughes v. Long*, 242 F.3d 121, 125 (3d Cir. 2001) ("Witnesses, including public officials and private citizens, are immune from civil damages based upon their testimony."). The DAO Defendants make a related point: Defendant Cameron is absolutely immune from suit for conduct related to his prosecutorial advocacy. ECF No. 23-1 at 12–13; *see also Imbler v. Pachtman*, 424 U.S. 409, 431 (1976) ("We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983") (citation modified).

Jordan counters by arguing that his deliberate deception claims are "based on *out-of-court* misconduct that led to the introduction of false and misleading testimony at trial," thereby evading the immunity issues related to false testimony at trial and to prosecutorial advocacy. ECF No. 50 at 36 (original emphasis); ECF No. 47 at 16 ("Mr. Cameron's actions were out of the bounds of prosecutorial advocacy and solely aimed towards investigative and administrative strategies to circumvent the production of *Brady* disclosures . . . ."). With respect to Defendant Cameron, Jordan relies on authoritative caselaw that stands for the proposition that prosecutors do not enjoy absolute immunity when they perform work outside the advocacy function, such as investigatory work or when prosecutors destroy exculpatory evidence. *See, e.g.*, *Fogle v. Sokol*, 957 F.3d 148, 160 (3d Cir. 2020) ("[A] prosecutor's 'investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.'") (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)); *Yarris v. Cnty. of*

*Delaware*, 465 F.3d 129, 136 (3d Cir. 2006) ("We believe that destroying exculpatory evidence is not related to a prosecutor's prosecutorial function.").

The specificity of Jordan's allegations concerning out-of-court conduct varies widely among Defendants. Jordan alleges that Defendant Griffin fired and damaged Nannette Jordan's service weapon and that this misconduct created false testimony that was used to convict him. Compl. ¶¶ 85–91. Jordan also alleges that Defendant Stott, together with Defendant Griffin, concealed the 2006 NIBIN report that led to the creation of false testimony concerning the strength of the ballistics evidence against him. *See, e.g.*, *id.* ¶¶ 114, 198, 202. Accordingly, Jordan has sufficiently alleged out-of-court conduct against Defendants Griffin and Stott to state claims for deliberate deception.

The Court agrees with Defendants that Jordan may not rely on any of Defendant Cameron's in-court statements to ground the deliberate deception claim against him. *See, e.g.*, *id.* ¶¶ 209–17 (alleging facts concerning Cameron's in-court, prosecutorial actions). But the Court agrees with Jordan that there are sufficient allegations about Cameron's non-prosecutorial conduct to state a claim for deliberate deception against him and his estate. According to the allegations, which the Court must accept as true at this stage, Cameron's advising the police about how to conduct investigations sounds more in the investigative realm than it does in the prosecutorial one. *Id.* ¶¶ 269–72. It is a tougher call to determine whether Cameron is absolutely immune concerning his participation in the H-Binder scheme. After all, "[i]t is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence, so long as they did so while functioning in their prosecutorial capacity." *Yarris*, 465 F.3d at 137. But because, under Plaintiff's allegations, Cameron's participation in the H-Binder scheme amounts to a "knowing failure to stop the removal of exculpatory material," that conduct is not within the

ambit of "presenting the State's case" and therefore not subject to absolute immunity. *Henderson v. Fisher*, 631 F.2d 1115, 1120 (3d Cir. 1980). Defendant Cameron may renew this argument at summary judgment if discovery provides a basis to assert that such conduct was properly within his prosecutorial function.

The allegations against Defendants Dusak, Maum, and Kuhlmeier are either impermissible group pleading or too threadbare to credit as true for purposes of this motion. *See, e.g.*, ECF No. 50 at 35; Compl. ¶ 38 (alleging vaguely that "Wexler's attorney alerted homicide detectives, including Defendants Detective Griffin, Detective Dusak, and Lieutenant Maum . . . ."); *id.* ¶¶ 193–94 (alleging generally that "Defendants Griffin, Dusak, Kuhlmeier, and Maum were aware of Harold Wexler's criminal activities . . . [but] withheld this information from prosecutors"). The Court's review suggests that there are not sufficient factual allegations concerning the out-of-court conduct of Defendants Dusak, Kuhlmeier, and Maum to state deliberate deception claims against them. Accordingly, this claim will be dismissed against them without prejudice.

The Court finds that Defendants are not entitled to qualified immunity on this Count. By 1942, "the [Supreme] Court extended th[e] right [to not be convicted on perjured testimony] by recognizing as a due process violation the conviction of a defendant through perjured testimony and the deliberate suppression of evidence favorable to the accused." *Dennis*, 19 F.4th at 289–90 (citing *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)). Accordingly, because the right in question was clearly established at the time of Jordan's conviction and because Jordan's allegations entail that Defendants Griffin, Stott, and Cameron violated this right, qualified immunity does not attach here.

D. *Count VI for Withholding Exculpatory Evidence*

Defendants move to dismiss Jordan's claim that they violated his Fourteenth Amendment rights by withholding and suppressing exculpatory and impeachment evidence against him. Their

sole argument is that they are entitled to qualified immunity because the "constitutional obligation to turn over evidence was not clearly established until the Third Circuit's ruling in *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427, 443 (3d Cir. 2005)." ECF No. 40 at 44; *see also Gibson*, 411 F.3d at 444 ("[P]olice officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor.").

The 2005 date of *Gibson* is material to determining whether Jordan had the right to not be convicted without having exculpatory evidence suppressed. Jordan was arrested in 2004 and his trial started on November 1, 2006. So, the Court must decide whether it is the date of trial (and conviction), the date of arrest, or some other relevant date that anchors when Jordan's *Gibson*-established right was allegedly violated. The Defendants' view is that the relevant time is when "the allegedly withheld documents were obtained by Defendant Officers." ECF No. 40 at 45. Jordan's view is that the violation occurs at any point during which his right to a fair trial, including his right to disclosure of exculpatory evidence, remains live.

The Court's view, at this stage of the proceedings, is that Jordan's position is more sensible. Because the "affirmative duty to disclose exculpatory evidence to an accused" is an ongoing one and because Defendants failed discharge it through November 1, 2006, the Court holds that the right was clearly established at the time of the violation and that Jordan sufficiently alleges that Defendants violated that right by failing to discharge their duty to disclose exculpatory evidence up to and during his trial. Accordingly, the Defendants are not entitled to qualified immunity on this claim.

E. *Count VII for Fabrication of Evidence*

To state a fabricated evidence claim, Jordan's allegations must make plausible that "there is a reasonable likelihood that, without the use of th[e] [fabricated] evidence, the defendant would not have been convicted." *Halsey*, 750 F.3d at 294. Jordan alleges that Defendant Griffin

fabricated evidence by tampering with and discharging Nannette Jordan's weapon to generate a misleading ballistics report and to ultimately incriminate him. Compl. ¶¶ 66–96.

Defendants argue that this claim should be dismissed because the allegations are "threadbare and speculative." ECF No. 40 at 31. The Court disagrees. Jordan alleges in detail that Nannette Jordan's weapon had not been fired for several months, that Defendant Griffin possessed the weapon for forty-five minutes before it was submitted to ballistics, that Defendant Griffin intentionally damaged the weapon to make it seem like it had been involved in a scuffle, and that Defendant Griffin discharged the weapon prior to a ballistics test to misleadingly suggest that Tracy Jordan had used this gun to murder Harold Wexler. *See supra* Section I. Those allegations are presumed to be true for this motion, and they suffice to state a fabricated evidence claim. To the extent that Defendants dispute the facts, summary judgment is the appropriate avenue to resolve those disputes.

The Court also finds that Defendant Griffin is not entitled to qualified immunity because, in addition to the sufficient factual allegations, *Halsey* states clearly that "by fabricating evidence for use in a criminal prosecution, a state actor would violate a defendant's constitutional rights." 750 F.3d at 295. And that right was established as early as 1942 in *Pyle v. Kansas* but certainly well before Jordan's arrest and conviction. *Id.* Therefore, qualified immunity does not attach here.

F. *Count VIII for Destruction of Evidence*

Plaintiff alleges that Defendant Griffin violated his Fourteenth Amendment rights by destroying and aiding in the destruction of exculpatory evidence. The destroyed evidence includes bags, fingerprints, security camera tapes from the day of the murder, and other evidence found at the murder scene. *See supra* Section I. To state a destruction of evidence claim, Jordan must allege that Defendants "fail[ed] to preserve 'evidentiary material of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the

defendant.'" *Yarris*, 465 F.3d at 142 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 56 (1988)). *Youngblood* additionally requires a showing of "bad faith on the part of the police . . . [which] necessarily turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." 488 U.S. at 58, 56 n.*.

Defendant Griffin argues that Jordan fails to plead Griffin was acting in bad faith when he allegedly destroyed the black bag, certain police activity sheets, and the security camera tapes from the day of Wexler's murder. ECF No. 40 at 34. The failure, on Griffin's view, is that Jordan does not allege that Griffin *knew* the exculpatory value of this evidence at the time it was destroyed. *Id.* Jordan responds by arguing that, under *Yarris* and *Youngblood*, bad faith and knowledge of exculpatory value may be inferred when "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." ECF No. 50 at 33 (quoting *Yarris*, 465 F.3d at 142 and *Youngblood*, 488 U.S. at 58).

At this stage of the proceedings, it is improper to resolve factual disputes. The Court assumes the truth of well-pleaded allegations, of which there are several concerning the destruction of evidence and what Defendant Griffin knew about the exculpatory value of such evidence. *See, e.g.*, Compl. ¶ 186 (Griffin was the lead investigator of the Wexler murder and maintained the case's H-File), ¶ 316 (Griffin destroyed Police Activity Sheets); ¶ 317 (Griffin destroyed security camera tapes). Defendants may renew their arguments about the factual insufficiency of this claim at summary judgment if a proper evidentiary basis to do so exists.

Additionally, Defendant Griffin is not entitled to qualified immunity on this Count because, in addition to the factual sufficiency of the allegations, the Supreme Court clearly established the due process right at issue here in *Youngblood* in 1988. *See also Yarris*, 465 F.3d at 143.

G. *Count IX for Reckless Investigation*

The Third Circuit has not recognized a claim for reckless investigation under the Fourteenth Amendment. *Harvard v. Cesnalis*, 973 F.3d 190, 207 (3d Cir. 2020) ("We have never recognized an independent due process right to be free from a reckless investigation."); *see also Johnson v. Logan*, 721 F. App'x. 205, 208 n.9 (3d Cir. 2018) ("[W]e have significant doubts about whether there is an independent substantive due process right to be free from reckless investigation."); *Geness v. Cox*, 902 F.3d 344, 354 n.5 (3d Cir. 2018). One reason for the Third Circuit's doubts is that a malicious prosecution claim—which the Court has declined to dismiss—captures much of the same misconduct that a reckless investigation claim would capture. Because reckless investigation is not a standalone claim, the Court grants this portion of the motion to dismiss. And, even if it were a standalone claim, it is clear from Third Circuit jurisprudence that the right at issue was not clearly established before 2006, meaning that the Defendants would be entitled to qualified immunity. Accordingly, the dismissal of Count IX is with prejudice.

H. *Count X for Failure to Intervene*

As Plaintiff himself concedes, "the Third Circuit has not yet had an opportunity to recognize a failure-to-intervene claim in the malicious prosecution context." ECF No. 50 at 42; *see also Thomas v. City of Harrisburg*, 88 F.4th 275, 285 (3d Cir. 2023) (recognizing a failure to intervene claim solely in the excessive force or sexual assault context); *Ogrod v. City of Phila.*, 598 F. Supp. 3d 253, 273 (E.D. Pa. 2022) (no obligation to intervene when another officer fabricates and withholds evidence); *Onyiah v. City of Phila.*, 660 F. Supp. 3d 407, 416 (E.D. Pa. 2023) (no obligation to intervene to prevent a coerced confession or malicious prosecution). Because this claim is not recognized as a standalone claim for purposes of this § 1983 action, the Court dismisses it with prejudice. And, just like for Count IX, even if it were tenable as a standalone claim, Defendants would be entitled to qualified immunity because the right was not

clearly established at the time of Jordan's arrest and conviction. The dismissal of Count X is therefore with prejudice.

I. *Count XI for Civil Rights Conspiracy*

To state a claim for civil rights conspiracy, Jordan must allege that "persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293–94 (3d Cir. 2018). A conspiracy also requires an agreement among the conspirators, and such agreement or "meeting of the minds or understanding . . . to conspire can be inferred from circumstantial evidence." *Id.* at 295 (citation modified); *see also Watson v. Sec'y of Pa. Dep't of Corr.*, 436 F. App'x. 131, 137 (3d Cir. 2011) ("[To] prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right.") (citations omitted).

In § 1983 actions, conspiracy claims typically depend on the underlying constitutional claims, such that conspiracy claims survive to whatever extent the underlying constitutional claims survive. *See Maldonado v. City of Phila.*, 2023 WL 4685967, at *8 (E.D. Pa. July 21, 2023) ("Civil rights conspiracy claims normally survive a motion to dismiss where the constitutional claims do too."). But conspiracy claims are not wholly parasitic on the underlying constitutional claims: they also require Plaintiff to "provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Jutrowski*, 904 F.3d at 295. Defendants argue that Plaintiff's claims fall short on this front.

The conspiracy that Plaintiff alleges involves Defendants Griffin, Dusak, Maum, Kuhlmeier, Stott, and Cameron. According to Jordan, Defendant Cameron stated in an email that "better detectives don't take notes or write down the obvious lies," that the District Attorney's Office "selectively disclos[ed] a witness's cooperation history so as to prevent defendants' counsel from learning of potential impeachment evidence," and that the DAO "advise[d] detectives to take

separate statements on other cases" involving a single cooperating witness to improperly limit disclosure. Compl. ¶¶ 269–72. At the motion to dismiss stage, these allegations are sufficient to make plausible that there was an agreement among the Officer Defendants and the Defendant attorneys to conspire to deprive Jordan of his constitutional rights. The civil rights conspiracy claim therefore survives insofar as the constitutional claims upon which it is premised have also survived the motion to dismiss because there are allegations sufficient to infer a conspiratorial agreement among Defendants.

J. *Count XII for* Monell *Liability against the City of Philadelphia*

Jordan brings a *Monell* claim in reliance on three municipal policies or customs. To state a *Monell* claim under this theory, Jordan must allege that "a widespread municipal practice, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). "A plaintiff presenting an unconstitutional policy must point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject . . . [a]nd if alleging a custom, the plaintiff must evince a given course of conduct so well-settled and permanent as to virtually constitute law." *Forrest v. Parry*, 930 F.3d 93, 105–06 (3d Cir. 2019). Generally, *Monell* claims are "not amenable to resolution at the pleading stage, as [they] require[] a plaintiff to plead facts outside his or her personal knowledge." *3909 Realty LLC v. City of Phila.*, 2021 WL 2342929, at *4 (E.D. Pa. June 8, 2021).

The first custom on which Plaintiff relies concerns how City of Philadelphia police officers curated a set of materials from their homicide files into H-Binders, so that prosecutors could then conceal potential impeachment and exculpatory evidence from defendants. Compl. ¶ 333. The second custom is the practice of using bunter mark comparisons as a basis to conclude there was

a positive ballistics match between a weapon and crime scene evidence. *Id.* ¶ 334. The third is the "widespread custom of conducting deceptive and malicious investigations of suspects, through illegal and unconstitutional methods." *Id.* ¶ 335.

Because Defendants did not substantively oppose the first custom, the Court agrees with Plaintiff that the Defendants have forfeited any opposition to this portion of the Count. *See Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("As a threshold matter, an argument consisting of no more than a conclusory assertion . . . will be deemed waived.").

Defendants argue that the second and third customs are insufficiently pleaded. ECF No. 40 at 49–58. The Court disagrees. For the second custom concerning the bunter mark comparisons, it is reasonable to infer from the Commanding Officer of the Firearms Investigation Unit's statement that the FIU stopped relying on bunter marks in early 2010 that, prior to 2010, there was a custom or policy of using bunter marks and that such custom or policy was in force during the investigation of Tracy Jordan. *See* Compl. ¶¶ 103–15, 253. The Defendants will have the opportunity to challenge Jordan's ability to prove this claim at summary judgment, but it is sufficiently pleaded to survive a motion to dismiss.

For the third custom concerning the City of Philadelphia's alleged "widespread practice of conducting deceptive and malicious investigations," *id.* ¶ 335, Defendants argue that the allegations do not sufficiently establish a custom because the other instances of misconduct are "temporally remote and vaguely pled." ECF No. 40 at 53–54. But Jordan's allegations concerning the misconduct inherent in the H-Binder practice and concerning the concealment and withholding of exculpatory evidence that led to the wrongful convictions of at least 49 other Philadelphians are sufficient to make out a plausible claim for *Monell* liability. *See* Compl. ¶¶ 255–66.

K. *Count XIII for Monell Liability against the District Attorney's Office*

The DAO Defendants argue that Jordan fails to state a *Monell* claim because the allegations are vague and boilerplate, because Jordan fails to allege conduct by a municipal decisionmaker, and because Jordan has not alleged that the putative policy caused the constitutional violations that he suffered. ECF No. 23-1 at 8–12.

The Court understands this *Monell* claim to be one concerning widespread customs, not an explicit and publicized policy. *See* ECF No. 47 at 8 (describing the *Monell* claim against the DAO as based on "four unconstitutional customs"). Accordingly, if Jordan sufficiently alleges that the four customs were "so widespread as to have the force of law," *Natale v. Camden Cnty. Corr. Facil.*, 318 F.3d 575, 584 (3d Cir. 2003), then those customs and practices are "ascribable to municipal decisionmakers." *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) (citation modified).

Jordan sufficiently alleges four DAO customs that can anchor his *Monell* claim. The first is the practice of relying on H-Binders curated by Philadelphia homicide officers so that prosecutors could effectively withhold documents from criminal defendants. Compl. ¶ 340. The second and third customs concern selectively documenting witness interviews and not disclosing witnesses' cooperation history to minimize impeachment evidence available to criminal defendants. *Id.* ¶¶ 341–42. The fourth involves the refusal to disclose Police Activity Sheets. *Id.* ¶ 343. Jordan alleges in sufficient detail how the customs operate, the pervasive nature of the customs in both the police department and the DAO, and how these customs resulted in his constitutional violations. *See, e.g.*, *id.* ¶¶ 185–207, 269–74, 316; *see also id.* ¶ 267 (discussing the New York University School of Law's 2024 report, "Prosecutorial Misconduct in the Philadelphia District Attorney's Office," that "documents a decades-long culture within the DAO of prioritizing

winning over justice [and] leading to dozens of documented wrongful convictions."). Accordingly, the Court rejects the DAO's arguments and denies the motion to dismiss this Count.

## IV. Conclusion

For the reasons stated above, the Court grants in part and denies in part Defendants' Motions to Dismiss (ECF Nos. 23, 40). An Order follows.